Good morning, Your Honors. May I please record? Good morning. Elsie, you may proceed. Thank you very much, Your Honor. Thank you. My name is Dan Harbottle. I'm here representing Irvine Unified in this longstanding dispute. Now we're on the fee at the fee stage. And we have two related orders under review today. I want to focus on the August 14, 2014 fee order and speak briefly about the relief order if necessary. I want to focus, too, on the fact that this August, 2014 fee order was followed in October, 2013 fee order that had initially denied all fees in the case entirely. Oh, you don't want to talk about the 60B? I do. At the end of my discussion, I would like to discuss that. I think the key point and the most egregious error in the Court's underlying decisions is the fee award itself. The relief award, I think, is also an error, but I think the fee award probably deserves most attention. All right, and that includes the cross-appeal. Correct. So in our presentations on both sides, we'll include the cross-appeal. Yes. Very well. So the October 14, 2014 fee order was really an error in two respects. First, it ignored the post-prevailing party status analysis that is required under Farrar following that case with civil rights actions. And it ignored its October, 2013 predecessor order and the equitable side of the argument in which the Court had determined that because of the fact that it's really demonstrable and truly indisputable, plaintiffs' counsel in the underlying case had pursued a different defendant of the three other than the Irvine Unified School District in Colorado. Well, except if you sort of look at this more globally, the fact that three of you want to fight over who's going to pay and you've got a kid that's going to get kicked out because they can't agree on it, they have to go forward. Right, and they did. And so really, if you sort of look overall, I mean, we have the case, the legal ruling in AS, which I realize is a non-Pub, but if you kind of look at the public policy of all of this in terms of that if we were to hold that the student is the prevailing party here, then that allows people not to fight about this and have people worry about, you know, whether they're going to get kicked out of something. They either, they've got to work it out or someone pays and then they fight it out after that. And you didn't do that here. Everyone was going like this and it went all around, but still you've got a kid that's about to, you know, is going to get kicked out and then... That didn't happen, Your Honor. Well, I know it didn't happen, but if you want to, you know, but I think the reasoning of AS is in terms of to be a prevailing party that the student, yeah, I mean the student had to fight to have assurance that the student would get FAPE. Well, that's actually... Paid for. That's actually fundamentally, the fundamentally incorrect premise that guided the underlying decision and I'll tell you why. Number one, upon the filing, and this is in the record numerous times, including in the district's court's October 2013 order, which is at ER 279 to 282, from the very filing in September of 2009, the underlying administrative law case, there was no dispute between any of the three agencies. But show me the money. Was anyone paying? Yes, yes, in fact they were. Prior to Irvine taking over, OCDE paid. Prior to that, and then Irvine took over. Did they have to go to court to force him to do that? No, they did not, Your Honor. That was by stipulation of the parties. Prior, so that he wouldn't... He didn't have to bring an action when he was about to get kicked out? Well, at that point, OCDE was paying. Once the, as I said, once the action was filed, all the agencies agreed that one of them was going to be responsible. Now, let me focus your attention on this point because this is really... And Orange County paid hard, you said? They paid up until Irvine paid, and then Irvine paid thereafter. Okay. And he graduated. Then what's at stake in this case? Merely that there wasn't... But then Irvine paid after, but now you're appealing that, right? No, no, that's over. That's long over. But you don't want to pay for the attorney's fees, right? Correct. And I'll tell you what. In October of 2009, about two weeks after counsel filed the administrative case, she filed a thing called a motion for statehood, which is a motion that would permit all the parties to just stay in their current places, Irvine keep paying until he graduated high school, which is another key point. That motion was not granted nor denied, and the reason why it was not is because counsel at that point, according to the OAH judge, quote, KG's motion is not supported by any evidence that KG's continued attendance at Daystar, the educational placement, is in any way threatened pending resolution of the financial responsibility issue at hearing. That's in ER 602. Further, he said, KG presented no evidence showing that there was any urgency to resolution of that issue. Finally, the same order upon which counsel has relied as sort of the vindication of KG's rights specifically says KG may file a new motion for statehood if supported by evidence that students' continued attendance at Daystar is jeopardized in some way by failure to resolve the financial responsibility issue. That was in October of 2009. There was never a new motion filed. There was never any risk to his attendance at the school. This is all briefed entirely in the paper. Had the student ever gotten anything that the student was in risk of getting kicked out? Never. Never had any risk of getting kicked out, and he was graduated with a regular high school diploma in April 2010, six months later, at which time, according to both our briefing and the amicus briefing of the NSBA and the CSBA, terminated any possibility that he could have any adverse outcome. He got what the IDEA promised him as of April 2010, and thereafter, at that point, counsel had expended approximately $10,000 in securing a high school diploma for KG, and no one had stood in his way. No one had stood in her way. She filed. We all agreed it was one of the three. We agreed that he would not be kicked out. We agreed that he would be funded through his graduation, and he was. And the court acclaimed that decision on the part of the agencies below. When he graduated in April 2010, that was it. There was no further risk. If there had been any, which there wasn't, there was no more. So your position would be what they should have done is just trusted you. No, no. That it would all be worked out, not done anything, then there wouldn't be any attorney's fees, and then... Look at it this way. No, is that your position, that they should have just trusted you? They did trust us, Your Honor. And they did not need to pursue. Yes, precisely. But what was at risk here? Nothing, Your Honor. The only risk was to the three agencies. There was no risk to KG, zero. And that is precisely the point. That is precisely what happened in the Farrar case. In fact, this case is better for our side of this argument than Farrar was, because in Farrar, the argument was plaintiff v. agency. And they prevailed directly. Was there any determination of the attorney fee amount as of April 2010? No, because there was no fee award. There was no fee motion made at that point. There was no decision at the OAH level made at that point. Yes, there actually had been, but there was no appeal of that until I think the trial briefs were filed in September 2010. So it became purely academic. Well, wasn't KG named as a party at some point? All the way through, Your Honor. KG couldn't ignore that, could it? Let's look at this fact. You're not really answering that question. We're having a lot of that today. Everyone wants to reframe the question. He could not ignore the fact that he was still a member of the case. However, let's look, for example, at counsel's own judicial notice request in response to the briefing here. They put in the ASB order, which was denied in its entirety for different reasons. But that student's attorney, through the Ninth Circuit, had generated $80,000 in fees. Those were denied for timeliness issues and other reasons. But here, this counsel, not Ms. Tiffany, but prior counsel, expended $22,000 at the OAH case to get a judgment, which occurred. She spent $66,000 or $67,000 thereafter seeking to vindicate my client from that judgment. Counsel for KG spent $67,000 seeking to vindicate the district from that. Okay, when you say seeking to vindicate, KG wasn't representing your counsel. KG just took a different litigation position. KG's counsel took the district's own litigation position from the very first moment of the case to the end. But KG was not interested in vindicating your client. KG was taking his, what he thought was his best litigation position, right? I don't know that because that was not his counsel. Well, was KG representing your client? No. Okay. But if you read the briefs carefully, there is not a single substantive argument made by KG's counsel against our client. Well, let me ask you, just put on a different hat. Suppose you were KG's counsel and you are served in this litigation, what should you have done or what would you have done? I would have monitored the litigation to ensure, as had been promised all along, including from the OAH judge onward, that one of the three agencies would be responsible. But that did not require, as I was about to say, $22,000 at the OAH level, $60,000-something at the district court, and $120,000 more at the Ninth Circuit, to make the same argument. And I also want to point out that this is not a typical litigation. The parties to this matter stipulated to a record of maybe an inch and a half or two inches of documentation and a set of stipulated facts. There were no depositions, there was no discovery, there were no interrogatories, there was nothing. There was stipulation on a written record, stipulation to written facts, a one-hour or two-hour oral argument before the OAH judge. Then there was the district court appeal on the very same issues and on the same record. And then there was the Ninth Circuit appeal on the very same record. Well, didn't the trial court take into account some of this in determining the fee award? Yes. Yes, that's correct. But did not follow Farrar. And the most important legal error, the most obvious legal error and the most critical legal error, was that in Farrar it's very clearly stated that the technical or de minimis outcome determination is not applied exclusively. It's actually applied primarily to the post-prevailing party analysis of whether an outcome is technical or de minimis. It's on page 11 of the... Well, we're running out of time, and I want to ask you a question about... It appears that when determining the amount of attorney's fees, the district court incorrectly stated that KG did not participate in the briefing of the appeals. Why shouldn't the district court's reduction of attorney's fees based on this mistake of fact be remanded for reconsideration? Because even though it was a misstatement, a regrettable misstatement, it was not... A mistake. It was not a reversible mistake. Why not? It was because it was a reasonable accommodation to what he clearly found was an otherwise unreasonable amount of time spent, for the very reasons I just laid out for you, that the same record applied all the way through. And once counsel got a judgment against one of the three agencies in November of 2010, there was literally no risk. No one made a motion to dismiss. No one threatened a motion to dismiss. No one ever, none of the agencies ever threatened to pull the plug on KG. Okay, but you're appealing attorney's fees, right? That's correct. Okay, so they had to file a brief in that, right? They had to file a brief in the attorney's fees element of this. Correct. And so it cost money to file that brief, right? That's true. And the trial court said that they didn't participate in the briefing on appeals. I don't think they, I don't think he, he didn't say that they didn't brief anything in the, I think he was very narrow. He did not participate in the briefing of the appeals. Okay, well, clearly. I've got, we got, we can pull the brief out. Now, okay, so my underlying argument here, and I think it's the key weighing factor here, is that in the October 2013 fee order, the court correctly found that it was inequitable. Given that this was an equitable analysis under which the court has to operate, it was inequitable for the AG who never took an adverse position against the district to be awarded fees under that scenario. Any fees or minimal fees? At that point he said no fees, correct. But he made that determination based, this court itself, the underlying district court, made the determination that the case was technical and de minimis once it was determined that one of the agencies was going to be, was going to guarantee the outcome. Well, so if we were to say, if we were to accept your opinion and we were to publish on that, this, which would be contrary to what AS says, correct, and say that they're not the prevailing party, then in the future agencies can do the exact same thing. No, Your Honor, exactly not. And let me explain why. We're not asking you to say that they're not the prevailing party. That has been decided. We're saying to apply the post-prevailing party analysis that is called for in Farrar. Farrar. Concede that they're the prevailing party? Yes, we do. They have to be. But there isn't anything published on that, is there? You're just saying based on AS? Based on AS, the underlying decision, Judge Selma determined that AS controlled, and they were the prevailing party. AS is a non-PEP, right? Right, but it still guided his decision, and I think that is just the law of the land at this point. We're not asking you to overturn that, and this is maybe the key distinction. We're having you look at Farrar, which specifically says that is not enough. In that case, the Court ordered prevailing party status. The Supreme Court upheld prevailing party status for that plaintiff, and then denied fees entirely because it was a technical or de minimis outcome, and that's what we have here. They denied all fees because there was no actual justifiable, there was no shifting of value that occurred at that point in the case. Think about this this way. Sometimes people ask me, why do you represent the school district and not the kids with special needs? We represent all the other ones. Oh, I understand that absolutely. $175,000, which is what the Court ordered ultimately, pays for three schools with special needs. The problem is when you have to do a FAPE, that we can't look at, I understand there's only a small pot of money, and I know districts are not rich, and they have all these other kids, and every time they have to pay big judgments, but by the same token, we can't go against the law because if you don't conduct yourself in accordance with the law, that's on you, not on, you know, I mean, that's part of why we publish sometimes, to say what it is. That's precisely the reason for our... Well, it's sort of like what you're telling me as I'm pulling food out of the bird's mouth and starving children over here. I mean, I'm quite familiar with that. I'm saying that for our demand that after a prevailing party determination is made, as was made here, that the Court must look to determine whether or not the outcome was technical or de minimis. This Court had already determined that the outcome of the case was technical or de minimis as to KG because KG had no bearing, no risk in the case, certainly after April 2010, and for our also counsels that at the time of a settlement or judgment, there must be some, in order to shift fees, there must be some direct benefit to the plaintiff. As of April 2010, the later OAH decision, or the later district court decision, had no bearing on him and no benefit, nor did the Ninth Circuit decision. Thank you, counsel. The time for your side has expired. We'll hear from counsel for KG. Thank you, Your Honor. Marcy Tiffany appearing for KG. Good morning. Good morning. Just maybe you can help me. I know this, you know, I'm just starting right out here, but am I confused or am I misinterpreting what he's saying in terms of that AS is not published, right? That is correct. So what is there out there that says that in this instance KG would be the prevailing party? Because I'm understanding him to say he's not contesting that. KG was the prevailing party by virtue of obtaining a change in the legal relationship between the student and one of the entities who now is in order to find... Right, but on these facts, let's just take the facts of this case, what is there published out there that establishes that? The district judge held that KG was the prevailing party. Right, but I'm talking to why we would want to publish one way or the other because AS is a non-PUP, correct? That's correct. And the district court was guided by that, but there really isn't anything out there that says on these facts that KG would be the prevailing party, right? I'm not aware of a published decision that would go directly to this particular fact situation. I would note, however, that in the administrative decision, at the end, there is a requirement to indicate who is the prevailing party, and that did indicate that KG was the prevailing party. So there is that with respect to this particular case. If I can address this issue, though, of whether KG was ever at risk of not being funded... Please do. I think that's a key concern. Yes. The facts here were stipulated, and they, from the very outset, and if you look at Exercise Record 624, which is the administrative decision, the facts are stipulated there. They never changed. The facts were that from July 2007 to 2009, the Orange County Department of Education voluntarily agreed to fund the placement pending some other court, some court resolution one way of this very difficult, complex issue as to who was responsible under these circumstances. In July 2009, a decision did come down from an administrative office in a separate case, but on the same issue, that held that it was the school district that had the legal responsibility. At that point, the Orange County Department of Education gave notice that it was no longer going to fund the placement at Daystar. And on September 1, there was an IEP meeting with the school district. September 1 of what year? Of 2009, subsequent to this. And the school district said, no, we are not going to fund this placement. Ms. Cromer was appointed by the Superior Court to pursue this case. After consulting with the Superior Court and with the guardian, who is the appointed guardian of KG, it was determined that the only way to safeguard and to make sure that KG was not going to be discharged from Daystar was to file this due process case and to seek a motion for stay put. That filing was September 21, as was the motion for stay put. At the time that motion for stay put was decided, Daystar had not yet actually given notice it was discharging the student. They knew it was coming. Conversations had been held. The funding was no longer there, but the funding had not quite yet run out. So Daystar hadn't given that official notice. And that's why the stay put order was denied at that time, subject to being renewed. That was October 6. On October 13, there was an IEP meeting with the district. And at that IEP meeting, and the facts state very clearly here, and this is stipulated facts, on October 13, 2009, Irvine Unified School District convened an IEP team meeting on behalf of students. At this IEP meeting, IUSD attached an addendum specifically disclaiming legal responsibility for the funding of the RTC placement and indicating that it had been informed by Council for Students that Daystar was preparing to discharge the student based upon the cessation of funding by the Orange County Department of Education. Irvine Unified School District only then stated it was willing to intentionally, to provisionally fund this placement while the litigation was pending. So Irvine stepped up to fund the stay put placement at that point, reserving all its rights and subject to the litigation going forward and making a final resolution as to who was responsible. But once the students had graduated, isn't it moot? The mootness argument, by the way, I believe is only raised by the amicus. It was never raised below. And in terms of mootness, nobody ever made a motion to dismiss for mootness. Had KG tried to dismiss for mootness, I am quite sure it would have been opposed by these other entities who wanted the case to go forward. Mootness just wasn't raised below, it wasn't raised by the district. But I'm looking at it from the standpoint of your client. Your client was the child. And once the child had graduated, there was no further risk to the child, was there? Once the child had graduated, there was no further risk to defunding the child, but the litigation was still there. KG could not just go in and unilaterally dismiss it. KG hadn't filed the appeal. By that time, the case was on appeal. Irvine had filed the appeal in the district court. KG wasn't in a position to dismiss that out. Why not? Well, because... From KG's individual interest. I mean, you have these three governmental entities fighting each other, but there was agreement that one of the three, no matter what, would pay. Never any risk. Actually, there never was any such agreement. There was no stipulation on the record that one of the three would pay. There was an understanding that under the statute, it was very likely that one of those three was going to be the responsible entity. There was no stipulation. But that being said, no one did move to dismiss. KG... The school district certainly knew that the student had graduated. They didn't move to dismiss on mootness, and KG was still there. Is there any risk that KG could have had to pay for this? The risk was that KG would have been discharged from the school. KG did not have the funds to pay for it. But I'm talking about after graduation, which was in June, as I understand it, of 2010, just a few months later? Yes. Your Honor, as I said, the mootness issue never arose and was not raised on appeal by the school district. This is only in the amicus brief. Secondly... I guess I'm not looking at it from the standpoint of preserving an issue. I'm looking at it in terms of the reality of the situation. Your client was never at risk, it seems to me, once that child had graduated. Now, there were some residual issues with respect to attorney's fees, but by that time, did it matter? It only mattered insofar as KG was still in the case, the case was still proceeding. But, Your Honor, this issue really would go to how much fees should be awarded. If the argument is that after April 2010, there was no point in actively participating in this litigation, then that would go to the court's determination as to how much fees to award. And the court reduced it by how much? The court actually made very substantial cuts. There was a 10% cut to begin with. Then there was a 50% cut in the appellate court proceedings. And then after all that was done, there was a 20% cut. And we are actually appealing both the 50% cut, not that there shouldn't have been a cut, but that the explanation for the cut and the amount of the cut was not justified by the court's explanation. In terms of the 20% cut, the explanation the court gave was that the issue of FAPE was not at issue. But that is, in fact, not a valid reason for giving a cut because under the IDEA, as this court has observed in the Weisberg case, there are other issues besides FAPE that warrant pursuing the IDEA remedies and would justify an award of attorney's fees. So simply because this wasn't FAPE doesn't mean that it should have been cut. And moreover, there was no explanation as to why 20% versus 10% versus 5%. This was just an arbitrary across-the-board cut. So we're not saying that the court couldn't have cut. The court considered all of these arguments, whether the briefing was on one side or the other side or who she supported. The court was aware of all of these things and took those into consideration, made the cuts it made. Counsel, was there any time after June of 2010 when you might have been able to make a motion to dismiss as to your client in terms of this three-way litigation? I don't know, Your Honor. I was not litigating at that time and I would have to do some research on the ability of a party to be able to dismiss out. This wasn't an interpleader. So KG was really the only one on the other side. So if you dismiss out the plaintiff, if you will, I'm not sure that a case can go forward with just the defendants fighting between each other. I don't think there's a case there anymore at all. Well, KG didn't initiate the... Help me sort out. KG was plaintiff up to a certain period. And then KG became the only defendant. Right. So if the defendant tries to dismiss the defendant out, what happens to the rest of the case? Well, the defendant shouldn't care under those circumstances. Well, that may be, and the court certainly could take that into consideration in deciding whether to award any fees after that date or how much fees to award. But again, that was the court's discretion. And these arguments certainly were presented to the court and the court made the cuts that it made. But doesn't that then, if you put it in that perspective, then doesn't that sort of go against your argument that the court abused its discretion by reducing in the amounts? That's your cross appeal, right? Our argument on cross appeal isn't that the court abused its discretion in doing reductions. It was the explanation that was provided didn't justify the reduction that was imposed. If the court had other reasons for doing a reduction, it certainly had the discretion to do so. But those specific reasons it gave and the specific amount it cut didn't justify the cut that was made. What about my question that I asked that the district court said that KG did not participate in the briefing of the appeals? We're mystified. We don't know why the court made that finding. It clearly was erroneous. Okay. Anything further, counsel? Yes, I'd like to briefly address this issue of the Farrar case and how that interplays with the prevailing party issue. In Farrar, the court was actually dealing with a situation that had been sort of created in an earlier case called Texas State Teachers Association v. Garland. And in that case, the court had held that if the degree of success is de minimis, that essentially you're not the prevailing party. So in Farrar, the court backed away from that and wanted to clarify its position. And what it said is, well, technically speaking, you may be the prevailing party, but if the result is de minimis, you don't get fees anyway. And in Justice O'Connor's concurrence, and she was the swing vote on this issue, she explains how to understand these two cases together. And what she said is, look, the issue of the significance of the reviews, whether it was trivial or de minimis, really does go technically to the degree of success. But it really doesn't matter which column you put it in, whether in Garland they put it in the prevailing party column, in Farrar they said no, it really goes into the degree of success column, which is technically correct. But that issue of whether this was a trivial de minimis result really goes to the degree of success, not to prevailing party status. And I will also say in Student v. Puyallup, this court even kind of mushed these two concepts together again and basically said, you know, where the plane of success on a legal claim can be characterized as a purely technical or de minimis, the plaintiff cannot claim fees as prevailing party. So these concepts really do get switched around, but technically speaking, if it's a de minimis technical result, that goes to the degree of success in the case. And what happened here is the district judge, when he first looked at it, said, well, I don't think this is a significant result, and so I'm not going to award any fees as prevailing party, you know, and relying on this language from Puyallup. Puyallup. Puyallup. I've really practiced this. It's between Tacoma and Seattle. I know. I looked it up last night how to pronounce it, and I'm still getting it wrong. What happened in A.S. is when it was appealed, and A.S. was virtually identical to this case on all fours, and in A.S. when the fee award was appealed and it was the exact same judge, exact same order, exact same rationale, the panel said no. This really is a substantial outcome. This obtained all of the benefits that they were seeking here. This wasn't just, oh, judge, you made a mistake by applying this to prevailing party. No, this was a substantial outcome, and it was exactly what they were trying to seek. You know, there was no way to win any more than what was won in this case, and that is what persuaded the district judge. Yes, it's not controlling authority, but since the district judge had made his decision in K.G. based solely on his decision in A.S., and now he was faced with a panel saying, eh, we think you got this wrong, he changed his mind. He was persuaded that, in fact, yes, this was a substantial outcome. This wasn't trivial, and this was deserving not only of prevailing party status but of a fee award. And then the only question is how much. So this idea that somehow the district judge got confused and applied the wrong standard and didn't do for wrong is simply a red herring. Not at all the case. By finding that this was not a trivial result, that really went to the issue of substantial success on the merits, and therefore entitled one to attorney's fees. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Rawlinson, Callahan